## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JUSTIN KELLER

and

HAILEY KARDUX

and

PATRICIA BANDY,

     *Plaintiffs*,

v.

MONROE CAPITAL CORPORATION
311 South Wacker Drive, Suite 6400
Chicago, Illinois

<u>Serve:</u>
The Corporation Trust, Inc.
2405 York Rd.
Lutherville Timonium, MD 21093-2264

and

MONROE CAPITAL BDC ADVISORS,
LLC

311 South Wacker Drive, Suite 6400
Chicago, Illinois

<u>Serve:</u>
CT Corporation System
208 S. LaSalle St., Suite 814
Chicago, IL 60604-1101

and

MONROE CAPITAL MANAGEMENT
ADVISORS, LLC
311 South Wacker Drive, Suite 6400
Chicago, Illinois

Civil Action No.:

CLASS ACTION COMPLAINT and
DEMAND FOR JURY TRIAL

<u>Serve:</u>
CT Corporation System
208 S. LaSalle St., Suite 814
Chicago, IL 60604-1101

    *Defendants*.

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all individuals similarly situated, by and through counsel, and file this Class Action Complaint against Monroe Capital Corporation, Monroe Capital BDC Advisors, LLC, and Monroe Capital Management Advisors, LLC (together, "Monroe Capital"), and allege as follows:

## PRELIMINARY STATEMENT

1.      This action arises from a fraudulent and predatory scheme initially designed by MV Realty PBC, LLC ("MV Realty") and financed, strategically directed, and monetized by Monroe Capital.

2.      Through their scheme, Monroe Capital and MV Realty sought to profit by exploiting vulnerable homeowners through a deceptive contract known as the "Homeowner Benefit Agreement" ("HBA").

3.      For most homeowners in the United States, their home is their largest asset. And almost all homeowners are just one personal disaster—like the loss of a job or the illness of a loved one—from needing access to their home's equity to stay afloat, whether through sale, refinance, or other transaction.

4.      These transactions, and the decisions that lead to them, can be the difference between financial stability and financial ruin.

5.      Defendants are private equity companies that conspired through dozens of sham real estate brokerage entities under the MV Realty flag to deceive vulnerable homeowners into 40-year "right-to-list" agreements in exchange for as little as a few hundred dollars.

6.      What MV Realty and, by extension, Monroe Capital concealed was that these contracts were secured by a recorded memorandum that operated as a lien on the homeowners' property.

7.      Using illegal robocalling schemes and deceptive internet advertisements, MV Realty and Monroe Capital targeted homeowners who were researching small short-term loans, or looking to refinance, with promises of a "no-risk" cash payment that was "not a loan" and never had to be re-paid.

8.      Once introduced to the MV Realty and Monroe Capital "Homeowner Benefit Program," homeowners were told that all they had to give MV Realty in exchange for the cash was the exclusive right to act as the homeowner's residential listing agent if they decided to sell their home at some point in the future. During these marketing pitches, homeowners were not told that the term of this "right to list agreement" would span **_forty years_**.

9.      Because these homeowners, including the putative class representatives, were not looking to sell at that moment, the offer seemed risk-free.

10.     Once they agreed, MV Realty ambushed them, for the first time, with a complex multi-page legal agreement called the "Homeowner Benefit Agreement" (HBA) at the same time the homeowner was to meet with a notary.

11.     Defendants knew that the homeowners would succumb to the real-time pressure to sign the HBA without reading or understanding its material terms.

12.     In addition to an onerous 40-year term, the HBA, among other things:

a. Gave Monroe Capital, through the MV Realty entities, the right to record the HBA in state land records, where Monroe Capital knew it would cloud the property's title and be treated as a lien or mortgage, preventing homeowners from refinancing or otherwise accessing their home's equity;

b. Guaranteed that Monroe Capital, through the MV Realty entities, except in very narrow circumstances, would receive guaranteed commissions, well in excess of market-rate commissions, regardless of whether they helped the homeowner sell the property; and

c. Bound the homeowner's heirs even after the homeowner's death.

13.    If homeowners questioned the onerous terms, MV Realty trained their marketing specialists to convince homeowners that MV Realty was "investing in a future relationship" with the homeowner and that the homeowner would gain the benefit of any-time access to a dedicated "licensed real estate broker."

14.    The reality, however, was that Monroe Capital never intended for MV Realty to sell any homes under the HBA. In fact, MV Realty, based in Florida, did not employ licensed realtors in states where Defendants induced homeowners into signing an HBA.

15.    Under the HBA, even if a homeowner wanted to sell and complied with all conditions, there was no obligation for MV Realty to make any effort to market the property.

16.    Instead, the true purpose of the HBA was to so completely frustrate the homeowner that they capitulated and paid an onerous penalty to terminate the HBA.  This "termination fee" was typically 3% of the home's value, making it at least ten times the amount of MV Realty's upfront cash payment.

17.     Despite assurances from MV Realty representatives that this product was "not a loan," for all functional purposes, the HBA Scheme functioned as a predatory high interest loan.[1]

18.      As described below, although MV Realty created this coercive and usurious "HBA Scheme," it was funded, refined, and controlled by Monroe Capital. In fact, Monroe Capital's involvement allowed MV Realty to scale the business model and expand its scheme from operating in a handful of states, to 33 states nationwide.

19.     Through the HBA Scheme, Monroe Capital prioritized inducing homeowners to pay the 3% penalty because it was significantly cheaper than the cost of actually marketing a property that a homeowner wanted to sell.

20.     Through the HBA Scheme, Monroe Capital targeted areas based on demographic and socio-economic factors that they believed would make homeowners more vulnerable to false promises of risk-free cash in exchange for a vague future obligation.

21.     As a result, more than 38,000 homeowners across dozens of states signed HBAs that were recorded in state land records at the direction of Monroe Capital.

---

[1] In fact, "[t]here are only two ways that a homeowner who accepts this deal can avoid repaying MV the cash advance plus many times that amount, calculated as 3.0 percent of current or future market value of their home plus an additional $500. First, if the homeowner lives another 40 years and never sells or otherwise transfers their home, then they will not have to repay anything to MV. It is unlikely that very many of MV's customers will fall into that category. Second, if the homeowner asks MV to list their home for sale, and home does not sell within six months, then the homeowner will have a 60-day window within which they may sell the home without owing MV any commission. Once the 60-day window ends, MV's right to substantial payment upon any sale of the property will spring back to life." *Massachusetts v. MV Realty PBC, LLC, et al.*, No. 2284-cv-02823-BLS2 (Mass. Super. Ct. Feb., 21, 2023).

22.     While several state Attorneys General[2] have sued MV Realty and its subsidiaries because of the HBA Scheme, Monroe Capital has escaped accountability despite perpetrating, expanding, and profiting from the HBA Scheme.

23.     Monroe Capital's conduct violates federal and state law, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Sherman Antitrust Act, state consumer protection laws, and common law torts.

24.     Plaintiffs, individually and on behalf of all others similarly situated, are homeowners who entered into HBAs with various entities operating under the MV Realty flag, and otherwise associated with, owned or directed by, and/or financed by Monroe Capital

## PARTIES

25.     **Individually Named Plaintiffs:**

      a.   Justin Keller and Hailey Kardux are Maryland homeowners who signed a "right-to-list" agreement with MV Realty on February 28, 2022 pursuant to the HBA Scheme and suffered economic and non-economic harm as a result of Defendants' unlawful practices. Mr. Keller and Ms. Kardux learned of the encumbrance on their property after attempting to contact MV Realty in late November 2022 about placing their home on the market.  MV proposed a list price that was well below market value.  They later tried to sell the home with another agent, but they could not obtain a sale price that would

---

[2] Upon information and belief, the HBA Scheme was operated in at least in 33 States. State Attorneys General have sued MV and its subsidiaries in Florida, Missouri, Georgia, Illinois, Indiana, Ohio, Massachusetts, North Carolina, Pennsylvania, New Jersey, and California.

offset the expected termination penalty owed to MV Realty.  Mr. Keller and

Ms. Kardux removed the home from the market and are still living there.

b.  Plaintiff, Patricia Bandy, resides in North Carolina and signed a "right-to-

list" agreement on February 22, 2021 pursuant to the HBA Scheme. She

first learned of the encumbrance on her title in late July 2022.  Ms. Bandy

subsequently paid a termination fee of $11,714.40 to terminate the HBA

agreement in September 2022.

26.    **Defendant Monroe Capital Corporation:** A Maryland company operates as a

private equity firm headquartered in Illinois, which invested in, controlled, and directly supported

MV Realty's operations, enabling its nationwide expansion.

27.    **Defendant Monroe Capital BDC Advisors, LLC:** A Delaware limited liability

company that serves as the investment adviser to Monroe Capital Corporation, headquartered in

Illinois, which invested in, controlled, and directly supported MV Realty's operations, enabling its

nationwide expansion.

28.    **Defendant Monroe Capital Management Advisors, LLC:** A Delaware limited

liability company operates as the administrator of Monroe Capital Corporation, a private equity

firm headquartered in Illinois, which invested in, controlled, and directly supported MV Realty's

operations, enabling its nationwide expansion.

29.    **Various other persons, firms and corporations,** not named as defendants have

participated as co-conspirators with Defendants and have performed acts and made statements in

furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of their co-

conspirators whether or not named as defendants in the Complaint.

## JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, there are approximately 38,000 potential class members, and many class members, including the putative class representatives, are citizens of different states than the Defendants.

31.    The Court also has subject matter jurisdiction pursuant to 18 U.S.C. §§ 1962 and 1964 (RICO), 15 U.S.C. § 15, and 28 U.S.C. §§ 1331 and 1337.

32.    This Court also has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

33.    This Court has personal jurisdiction over the Defendants.  Personal jurisdiction over the Defendant Monroe Capital Corporation is appropriate because Monroe Capital Corporation is incorporated in the State of Maryland.

34.    Personal jurisdiction over Defendants Monroe Capital BDC Advisors, LLC and Monroe Capital Management Advisors LLC is proper and authorized under the Maryland long-arm statute, Md. Code Cts. & Jud. Proc. § 6-103, because these Defendants transacted business in the State of Maryland; derived substantial revenue from business in the State of Maryland; have contracted to supply services in the State of Maryland; have caused tortious injury in the State of Maryland by acts and omissions in the State; and have caused tortious injury in the State of Maryland by acts and omissions outside the State.

35.    Personal jurisdiction over Defendants Monroe Capital BDC Advisors, LLC and Monroe Capital Management Advisors LLC is also proper and consistent with due process because these Defendants intentionally, voluntarily, and purposefully availed itself of the jurisdiction of Maryland courts through their ongoing and regular business contacts in the State. Specifically, as

a direct result of these Defendants' business dealings, MV Realty received a $40 million credit facility which allowed MV Realty to expand into Maryland, and recorded memoranda of HBAs in Maryland land records beginning in the second half of 2021.

36.     Personal jurisdiction over the Defendants is also proper pursuant to established conspiracy jurisdiction principles. Specifically, Monroe Capital BDC Advisors carried out overt acts as investment advisor to Monroe Capital Corporation in furtherance of a conspiracy within Maryland, namely, by engaging in due diligence, authoring a presentation that encouraged the nationwide expansion of the HBA model (including into Maryland), and directing aspects of the program to safeguard investor returns.

37.     Based on publicly available information, including Monroe Capital's SEC filings, Monroe Capital Corp., Monroe Capital BDC Advisors, LLC, and Monroe Capital Management Advisors, LLC are so closely intertwined in structure, leadership, and operations that they function as a single unified enterprise. All three entities share the same corporate headquarters at 311 South Wacker Drive, Suite 6400, Chicago, Illinois, and they maintain overlapping executive leadership, including CEO Theodore L. Koenig, who is the controlling figure across the Monroe platform. Monroe Capital BDC Advisors, LLC serves as the external investment adviser to Monroe Capital Corp., while Monroe Capital Management Advisors, LLC manages affiliated private investment funds. Their websites and SEC filings demonstrate unified branding, co-investment across entities, shared personnel, and integrated oversight of portfolio investments—including the $40 million credit facility provided to MV Realty. This level of entanglement renders any formal distinctions between the entities superficial; in substance and function, they operate as one and the same for purposes of liability and jurisdiction.

38.     Venue is proper in this District under 18 U.S.C. § 1965 because the Defendants transact business in the State of Maryland.  Venue is also proper in this District under 28 U.S.C. § 1391(b) because a Defendant resides in this District and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### A.  MV Realty Creates the HBA Scheme (2018-2020)

39.     In August 2017, an entity named Innovatus Capital Partner, LLC approached MV Realty with an "innovative" method to create a new class of securitized asset, akin to a mortgage, by providing homeowners with a "promotional fee" in exchange for entering into an exclusive "right-to-list" agreement. Innovatus and MV Realty took steps to facilitate a joint venture.

40.     In April 2018, MV Realty informed Innovatus that they intended to pursue the "right-to-list" scheme with another partner, 777 Capital, and not Innovatus. Innovatus later sued MV Realty for "stealing" the idea.

41.     777 Capital provided direct financing to expand MV Realty's HBA Scheme from 2018 through 2020. 777 Capital took a 60% equity stake in MV Realty as part of its financing.

42.     MV Realty first began signing Homeowner Benefit Agreements (HBAs) in Florida in 2018. Early in the HBA Scheme, MV Realty was in the practice of recording the HBA as a lien on each property, but over time, this practice became the lynchpin of the new asset class.

43.     As alleged above, far from a financial benefit to homeowners, the HBA contains many terms that impose significant additional costs on homeowners and multiple novel material terms that are dramatically different from traditional contracts between homeowners and real estate brokers. Homeowners were locked into a 40-year "right to list agreement" that placed a cloud on

their title and required them to pay 10x the amount of MV Realty's upfront cash payment, with MV Realty having little incentive to actually market their homes if they decided to sell.

44.    As 777 asserted more control over the HBA scheme, it implemented an official policy of recording a lien on each HBA property within 48 hours of origination.

45.    On information and belief, however, in about 2019, 777/MV Realty was advised by legal counsel that they could only file a "memorandum" in the state land records, and not a lien. But even though the title of the document changed, 777/MV Realty intended for the filing to operate as a lien.

46.    MV Realty lacked sufficient cash flow from its initial operations in Florida to expand the HBA Scheme into other states and relied on investor funds to originate new HBAs and perpetuate the HBA Scheme.

47.    In seeking additional investment for expansion of the HBA scheme, 777 Capital/MV Realty produced investor presentations that emphasized the recorded security interest and that "the homeowner is unable to transfer title without receiving a ***lien release*** from MV Realty."

48.    In furtherance of their plans for expansion, MV Realty began creating special purpose entities, including Receivables I, II, and III ("Receivables Entities") in January 2020. The stated purpose and business of the Receivables Entities was to engage exclusively in activities that included purchasing, acquiring, or accepting from MV Realty under a purchase and contribution agreement all of MV Realty's right, title, and interest in HBAs and to own, sell, transfer, finance, and otherwise deal with the HBAs.

49.     It was intended that the Receivables Entities would, in turn, pledge the HBAs acquired from MV Realty as collateral to investors (*i.e.*, Monroe Capital) for the purpose of receiving advances used by MV Realty to originate new HBAs.

### B. Monroe Capital Finances and Perpetuates the HBA Scheme (July 2021)

50.     In July 2021, Monroe Capital became MV Realty's sole secured creditor, directly financing additional advertising/targeting of consumers and funding of the promotional fees, perpetuating the fraudulent HBA Scheme throughout the country. The Monroe entities agreed to lend $40 million, securitized by HBA receivables, for expansion of the HBA scheme, and took a 4% equity stake in MV Realty (the "Monroe Credit Facility"). This funding allowed the rapid expansion of the Homeowner Benefit Program.

51.     As alleged below, Monroe Capital entered into the Monroe Credit Facility with full knowledge of the nature of these assets, as in doing their due diligence it would have been revealed how the HBAs worked.[3]

52.     In response to an investigative demand issued by the Attorney General of Georgia, Monroe Capital produced a document titled "MV Receivables II, LLC New Business Presentation" dated May 28, 2021 ("Business Presentation"). This due diligence presentation was authored by Defendant Monroe Capital BDC Advisors, LLC ("Monroe BDC Advisors").[4]

---

[3] As Illinois Attorney General Kwame Raoul stated to the *Chicago Sun-Times* in April 2024, "[t]hey're [Monroe Capital] obviously aware of the business model. It had to raise some questions of – were they comfortable with the legality of it? *'Deceptive' Real Estate Firm Tied to Loop's Monroe Capital Sued by Kwame Raoul*, CHICAGO SUN TIMES, Apr. 19, 2024, *available at* https://chicago.suntimes.com/the-watchdogs /2024/04/19/illinois-attorney-general-raoul-housing-lawsuit-florida-mv-realty-monroe-capital (accessed July 25, 2025).

53.     Among other topics, the 39-page Business Presentation contains summaries of MV Realty's HBA Scheme, background on MV Realty's principals and owners, financial data regarding revenue generated from "harvests" of HBAs, financial projections tied to MV Realty's plan for expansion, and a potential "Exit Strategy." This presentation demonstrates that Monroe Capital was aware of the coercive, usurious, and deceptive aspects of the HBA Scheme and acted in furtherance of that Scheme.

54.     As stated in the second paragraph on page 1 of the Business Presentation, funds from the Monroe Credit Facility were used to expand MV Realty's operations across the country by originating 28,000 new HBAs, and MV Realty's plan was to eventually securitize.

55.     As stated on page 1 of the Business Presentation, MV Realty earns an internal rate of return of 150% on an HBA and "[i]mportantly, the FLC (referring to an HBA), is recorded on the home title . . . so the homeowners are unable to sell the homes with clean title without paying MV[R] its commissions."

56.     On page 35 of the Business Presentation, potential exit strategies were listed and included "Portfolio Securitization" and/or "Sale of the Company."

57.     The information in the Business Presentation further confirms, among other things, that MV Realty did not intend to operate as a residential real estate firm and instead intended to record Memoranda on consumers' homes to cloud the title and to generate and secure an asset that could later be sold to investors.

---

[4] According to Monroe Capital's public SEC filings, MC Advisors was responsible for sourcing investment opportunities, conducting due diligence, preparing "comprehensive new business presentations," and handling investment structuring, execution, and portfolio monitoring.

58.     Monroe BDC Advisors' presentation outlines how MV Realty's business model depends upon termination events, *e.g.*, when homeowners breach the HBA terms by listing their home with another broker. It includes projections showing that termination fees are a core source of revenue, and HBAs are enforced via recorded lien-like instruments, and "legal enforceability" of these liens is cited as central to the value.

59.     Page 10 of the New Business Presentation details how MV Realty tracks contracts via daily searches through twelve different MLS monitoring systems to ensure there are not any "unauthorized listings." Agents contact the property owner and, if the "default" on the HBA is not cured, demand letters are sent and MV Realty begins a legal process to "realize the value" of the HBA by filing a *les pendens* on the property to restrict the title company from transferring title.

60.     Based on this due diligence document, Monroe Capital understood and intended that expansion of MV Realty's business model nationwide was not about performing actual real estate brokerage services, but rather about extracting financial penalties from unsuspecting or distressed homeowners—a structure that resembles coercive debt instruments.

61.     Monroe Capital was aware that consumer confusion, information asymmetry, or desperation were essential to the Homeowner Benefit Program's profitability.

62.     The asset-backed homeowner obligations to MV Realty were pledged as collateral by MV Realty to Monroe Capital under the Monroe Credit Facility. In other words, if MV Realty were ever to default on the loan, Monroe Capital could take ownership of the HBAs (and the future income they produce). Monroe Capital thus had a direct economic stake in enforcing the HBAs, and motivation to oversee or influence MV Realty's business practices.

63.     Concurrent with MV Realty's entry into the Monroe Credit Facility, MV Realty's affiliate MV Realty Holdings, LLC ("MV Holdings") entered into an Equity Purchase Agreement

(the "EPA") with affiliates of Monroe Capital, dated July 28, 2021. Under the EPA, affiliates of Monroe Capital purchased shares issued by MV Holdings and received warrants to purchase additional shares of MV Holdings.

64.     Under Section 6.07 of the EPA, MV Holdings granted Monroe Capital board observation rights that include:

> . . . observation rights at all Board of Directors meetings of the Company (or any committee thereof) for so long as any Investor holds any Purchased Units, Warrants, or Warrant Units. At each such meeting, the Agent [Monroe], at its option, shall be permitted to have a designee attend in-person or via telephone for sessions covering matters relating to the Company's business including . . . operational details (including financial performance, operations, credit, and collection and servicing); . . . [and] legal and regulatory updates . . . . The Agent shall be provided, in advance, all materials provided to the Board of Directors . . . for such meetings.

65.     In other words, Monroe Capital not only extended financing and received an equity stake in MV Realty, but it also obtained board observation rights that granted privileged access to internal financial, legal, and operational information.

66.     On information and belief, Monroe Capital regularly audited the performance of the HBA Scheme and received real time data tape containing transaction information on HBA originations and terminations.

67.     In sum, the combination of financing, equity participation, oversight, and profit extraction placed Monroe Capital at the heart of the HBA Scheme, positioning it not merely as a lender, but as an active strategic partner in MV Realty's business model.

68.     Monroe Capital knew, or should have known, of the unlawful, deceptive, and misleading methods MV Realty employed to originate HBA obligations from homeowners and was aware and intended that the Monroe Credit Facility would be used to expand and facilitate the expansion of MV Realty's HBA scheme nationwide.

69.     Monroe Capital entered into the Monroe Credit Facility with wanton disregard for the harm and/or damages MV Realty would cause homeowners through the use of that facility to fund the initial payments to homeowners to induce them to unwittingly grant liens or other encumbrances against their homes to MV Realty.

70.     As late as 2023, Monroe Capital was still providing investment to expand the HBA Scheme into additional states. On information and belief, given Monroe's equity stake, board observation rights, and access to MV Realty's legal and operational materials, Monroe Capital was aware of and approved this expansion strategy, including the emphases on lien recordability as a predicate for entering new markets.

71.     As alleged below, throughout 2021-2023, Monroe Capital exerted significant control over the HBA Scheme, including setting the material terms of HBAs, and became party to all subsequent agreements with affiliates, including brokers, who marketed and sold the HBA program.

### C.  The Expansion of the Homeowner Benefit Program (late 2021-2023)

72.     Having secured substantial funding from Monroe Capital and aligned its business model around investor expectations, MV Realty aggressively scaled its operations through a suite of deceptive and highly targeted marketing practices designed to exploit vulnerable homeowners.

73.     The infusion of cash provided by Monroe Capital allowed MV Realty, with Monroe's strategic input and approval, to greatly expand its aggressive marketing infrastructure.

74.     Within months after Monroe Capital's investment, regulatory and other watchdog authorities documented widespread use of robocalls, deceptive caller-ID spoofing, geo-fencing ad targeting, and door-to-door sales.

75.     Beginning in late 2021, MV Realty engaged in an expanded robocall campaign that placed millions of calls, many to numbers on the National Do-Not-Call Registry. One former MV Realty employee whistleblower stated "[w]e were required to make at least 450 outbound calls a day," targeting people who were low-income or behind on bills.[5]

76.     As noted above, MV Realty also used "geo-fencing" real-time marketing efforts to target homeowners in financial distress, such as those who were searching online for pay-day loans or who were researching refinancing options.

77.     MV Realty also used geo-fencing to target homeowners searching for terms including "homeowners stimulus package," "stimulus mortgage relief," and published ads that misleadingly suggested the HBA Program was affiliated with government relief programs by using terms like "stimulus," "benefit funds," or "the relief you need."

78.     MV Realty advertised the HBA Scheme, also called the "Homeowner Benefit Program" (HBP) through Google Advertising:

---

[5] Jason Stoogenke, *Realty Company Offers Fash Cash, But Locks You in to 40-Year Commitment*, WSOC-TV, November 17, 2022, available at https://www.wsoctv.com/news/local/action-9-fast-cash-homeowners-comes-with-strings-attached/ZMBIT653MJCZHKOAHT5DHJ5BX4/ (last accessed July 25, 2025); *see also FCC Warns Providers About Robocalls from PhoneBurner and MV Realty*, FEDERAL COMMUNICATIONS COMMISSION, Jan. 24, 2023, *available at* https://www.fcc.gov/document/fcc-warns-providers-about-robocalls-phoneburner-and-mv-realty (last accessed July 25, 2025).



79.     MV Realty used the false promise of "up to $5,000" to lure vulnerable consumers to click the ad. But the actual cash amount offered was about 0.03% of whatever value Defendants assigned to the property, resulting in promotional fees almost always less than $1,000.

80.     MV Realty also advertised on social media platforms, stating that consumers had "no obligation to return the payment" and "no obligation to sell":



81.     Once lured to the HBP website, homeowners were bombarded with additional false statements and promises of risk-free cash with no credit check, no interest, and no obligations.



82.    If a homeowner clicked on an MV Realty advertisement and expressed interest by providing personal contact information, MV Realty would follow up with a barrage of calls and text messages. This marketing told homeowners that MV Realty's offer of a cash payment "requires no repayment," that MV Realty would pay the money with "no strings attached," or that MV Realty would never "come after" the homeowner "for anything."

83.    MV Realty trained their telemarketers to convince putative class members who needed more money than MV Realty was offering, or who were looking to refinance, that the HBA promotional fee was a risk-free way to get 'closer' to either goal.

84.    For example, when a prospective lead indicated that they needed more money than MV Realty was offering via promotional fee, MV Realty trained their telemarketers to respond:



85.    Similarly, if a prospective lead indicated that they wanted to refinance, MV Realty trained their telemarketers to respond that the HBA was "better than a loan" because it required no credit check and no repayment, and that the homeowner could use the funds to cover costs associated with refinancing.

86.    What they failed to tell homeowners was that MV Realty would, within 48 hours of signing the HBA, record the agreement in the state land records, preventing any effort to refinance or sell unless MV Realty agreed to subordinate their lien interest on the property.

87.    To combat homeowner skepticism, MV Realty recruited struggling or inexperienced licensed realtors as telemarketers. MV Realty trained these realtors to persuade homeowners that the licensed realtors were bound by a code of ethics and that MV Realty was "investing" in a future relationship with the homeowner.

88.     MV Realty and Monroe Capital knew that these marketing promises—risk free cash with no obligation—would lead vulnerable and unsophisticated homeowners to believe that this was a simple transaction, and indeed, this deception was central to the success of the HBA Scheme.

89.     Ultimately, consumers in approximately 33 states, including the State of Maryland, fell victim to MV Realty and Monroe Capital's HBA Scheme, leading to thousands of improper and illegal liens unbeknownst to homeowners.  With clouded title, these homeowners were deprived of access to equity and lost the opportunity to refinance and sell their homes.

**D.  *Monroe Capital's Direct Activities in Perpetuating the HBA Scheme.***

90.     As alleged above, beginning in 2021, Monroe Capital financed the rapid expansion of the fraudulent and predatory HBA Scheme with the goal of scamming American homeowners. Thereafter, Monroe Capital further developed and orchestrated the HBA scheme.

91.     Because existing HBAs were pledged as collateral as part of the Monroe Credit Facility, Monroe Capital directly benefited financially from the HBAs executed through MV Realty prior to July 2021, and in the future.

92.     Specifically, the repayment structure was based on time-based revenue flows rather than limited to HBAs entered into after the credit facility was executed. According to statements by MV Realty executive Bruce Mitchell, during the first year of the facility—while MV Realty was still drawing down on the $40 million line of credit—revenues from harvested HBAs were directed to MV Realty. However, because those HBAs, including many executed before Monroe's involvement, served as collateral, MV Realty was required to substitute in a new HBA of equivalent value for each one harvested, ensuring that Monroe retained the same collateral position.

93.    Once the $40 million facility was fully drawn, Monroe Capital began receiving 50% of the proceeds from all harvested HBAs, regardless of whether the underlying agreement predated Monroe's investment.

94.    After the second year of the facility, 100% of harvest proceeds were paid to Monroe. Thus, Monroe's financial gains were not limited to HBAs it directly funded, but extended to MV Realty's existing portfolio, including agreements secured through earlier marketing and business practices.

95.    With respect to MV Realty's business operations from late 2021 through 2023, testimony and internal statements filed in the various Attorney General actions against MV Realty suggest that Monroe Capital's involvement went far beyond passive investment. MV Realty personnel have acknowledged that key program terms—such as homeowner payout amounts and valuation rules—were shaped to meet Monroe Capital's investor expectations.

96.    Most notably, Todd Schneider, a former real estate agent and sales team leader for MV Realty, testified in a deposition in 2023 about MV Realty business model, and Monroe Capital's involvement in the same as part of the enforcement action brought by the Indiana Attorney General's Office.

97.    Mr. Schneider testified that certain high-level MV Realty personnel, including Joe Shaia (Operations Manager) and Melinda Vaga (National Sales Manager), informed him that valuation rules for HBAs were dictated or directed by Monroe Capital's investor requirements.

98.    In addition, Schneider also testified that MV Realty reduced homeowner payments when interest rates rose in order to satisfy Monroe Capital's investment return expectations, demonstrating Monroe Capital's influence and control over consumer-facing contract terms.

99.     According to Mr. Schneider, Monroe Capital not only funded the program but also participated in securitizing the HBA contracts and selling them to third parties, transforming future termination fee obligations into financial products.

100.    On information and belief, Monroe Capital's financing agreements required MV Realty to obtain approval before entering new markets, particularly because Monroe's valuation and risk models were tied to enforceability of the liens and harvest rate projections in each state.

101.    In addition, to protect its investment in the HBA Scheme, Monroe Capital directed MV Realty to obtain "backup brokers"—secondary real estate agents assigned to homeowners who had signed HBAs to address circumstances such as where the original MV Realty agent had left the company or moved. Monroe Capital and MV Realty did not want to risk losing the ability to enforce termination penalties just because MV Realty had no available agent. Thus, to preserve Monroe Capital's right to enforce the HBA, MV Realty assigned a backup broker to the file as a placeholder agent of record, even if that agent didn't do any substantive work.

102.    A "Backup Servicing Agreement" described in the Indiana Attorney General's enforcement action repeatedly references Monroe Capital and explicitly defines rights and powers Monroe held in connection with broker assignments. In summary, the agreement:

>     a.   Provides that "the lender," defined as Monroe, must approve the assignment of backup brokers—giving Monroe gatekeeping control over who may act on behalf of MV Realty in transactions that affected its collateral interests;
>
>     b.   Grants Monroe Capital (as lender) the power to act directly in place of MV Realty, including the right to assign or remove backup brokers—showing that Monroe Capital could effectively substitute itself into MV Realty's position to protect the value of its collateral (the HBA);

    c.   Gives Monroe Capital access to transactional records, listing agreements, and broker communications for properties secured by HBAs, demonstrating Monroe Capital's operational visibility and participation in enforcement;

    d.   Reaffirms that any value derived from backup broker activity (*e.g.*, a 3% termination fee or commission) is part of Monroe Capital's secured capital—giving Monroe Capital a direct financial interest in ensuring backup brokers are used and HBAs are enforced.

103.    As alleged above, Monroe Capital financed the expansion of the HBA Scheme with full knowledge each HBA was a predatory loan, and that most of the profit from MV Realty's business model came from harvesting early termination fees (and not actual brokerage services).

104.    Notably, the New Business Presentation authored by Monroe Capital lists MV Receivables II as operating in the "banking and finance" industry. In subsequent SEC filings, Monroe Capital declared that its portfolio was in the banking industry, rather than the real estate industry.

105.    An investigation by the Office of the Attorney General of Georgia found that, between January 2021 and December 2022, early termination fees accounted for **77%** of all harvests during this period. On information and belief, this percentage was representative of the distribution of harvests nationwide after MV Realty's explanation; that is, MV Realty and Monroe routinely harvested more early termination fees than it collected earned commissions.

106.    The number and percentage of homeowners who were forced to pay MV Realty's usurious early termination fees increased as a direct result of Monroe Capital's involvement in the expansion and operations of MV Realty between July 2021 and late 2022.

107.    As part of its investment in MV Realty, Monroe Capital became a strategic partner with respect to MV Realty's marketing practices. Page 8 of the New Business Presentation analyzes MV Realty's marketing efforts and customer acquisition costs and contains a statement confirming that MV Realty purchased consumers' leads from mortgage servicers and originators and consumer lenders. The New Business Presentation noted "the deal team is confident in [MV Realty's] ability to scale the customer acquisition model to effectively deploy the Facility and expand the [HBA] portfolio…"

108.    After Monroe Capital became involved in MV Realty's business operations as its sole secured creditor, MV Realty used those funds to greatly expand its telemarketing and "geo-fencing" efforts to target vulnerable homeowners.

109.    MV Realty's deceptive marketing practices in late 2021 and beyond—including advertising the Homeowner Benefit Program as a "government grant" or "stimulus," and assurances that the HBA "is not a loan"—were not merely internal business decisions. Rather, they were implemented with the knowledge and involvement of Monroe, which exercised substantial oversight to protect its investment.

110.    Monroe Capital reviewed and approved marketing strategies as part of its ongoing monitoring responsibilities and had visibility into the representations being made to homeowners.

111.    Given the inherently misleading nature of the MV Realty marketing strategies and advertisements and their centrality to generating "harvest events," Monroe either directed or approved of these marketing tactics as a means of maximizing returns on its secured loan portfolio.

112.    By actively monitoring performance triggers tied to the volume and enforcement of HBAs, Monroe had a financial incentive to support aggressive—and misleading—consumer outreach.

### E.  Harm to Homeowners Caused by the HBA Scheme

113.    Through the HBA Scheme, homeowners nationwide were saddled with liens on their properties, reducing their marketability and equity and causing past, present, and future financial harm.

114.    Homeowners have also faced emotional and financial distress due to the onerous terms of the HBA agreements.  These homeowners were unable to sell, refinance, or obtain equity from their homes for the duration of these illegal liens.

115.    On information and belief, some homeowners have even lost their homes when they fell behind on mortgage payments, but were unable to modify their loans because they could not afford to pay the early termination fees required to clear the cloud on their title.

116.    Plaintiffs and Class Members have suffered damages including diminished property values, financial penalties, emotional distress, and legal costs to address the liens.

## CLASS ACTION ALLEGATIONS

117.    Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23.

118.    Plaintiffs are adequate representatives of the putative Class because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel that is experienced in complex consumer class action litigation, they intend to vigorously prosecute this action on behalf of the putative Class, and they have no interests that are antagonistic to those of the putative Class.

119.     A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual class members are relatively small compared to the burden and expense of individual litigation of

their claims against Defendants. As a result, it would be virtually impossible for the Class

Members, on an individual basis, to obtain effective redress for the wrongs committed against

them. And even if the Class Members could afford such individualized litigation, the court system

could not. Individualized litigation would create the danger of inconsistent or contradictory

judgments arising from the same set of facts. Individualized litigation would also increase the

delay and expense to all parties and the court system from the issues raised by this action. By

contrast, the class action device provides the benefits of adjudication of these issues in a single

proceeding, economies of scale, and comprehensive supervision by a single court, and presents no

unusual management difficulties under the circumstances.

120.    Defendants have acted or failed to act on grounds applicable to the putative Class,

necessitating class-wide declaratory and injunctive relief.

121.    The proposed Class is defined as:

      a. **Class 1:** All homeowners in the United States who have current liens placed

          on their properties by MV Realty under the Homeowner Benefit Program.

      b. **Class 2:** All homeowners in the United States who paid penalties to

          terminate their agreements with MV Realty.

122.    <u>**Numerosity**</u>: The putative Class consists of tens of thousands of members, making

joinder impracticable.

123.    <u>**Commonality**</u>: Common questions of law and fact include:

      a. Whether Defendants engaged in a RICO enterprise;

      b. Whether the association of Defendants and MV Realty in designing,

          creating, funding, and perpetuating the HBA Scheme constitutes an

          "enterprise" for the purposes of 18 U.S.C. § 1962;

c.  Whether Defendants' activities in furtherance of the HBA Scheme constitute racketeering activity;

d.  Whether Defendants used U.S. Mail and interstate wires in furtherance of the HBA Scheme, constituting a pattern of racketeering activity;

e.  Whether Defendants received income derived, directly or indirectly, income from racketeering activity;

f.  Whether Defendants, through a pattern of racketeering activity, acquired or maintained, directly or indirectly, interest or control of an enterprise engaged in or the activities with affect interstate commerce;

g.  Whether Defendants conspired with MV Realty to violate RICO;

h.  Whether Defendants violated the Sherman Act by conspiring to fix the commission fees charged to and paid by Plaintiffs and the putative Class Members;

i.  Whether Defendants violated the Sherman Act by artificially inflating the estimated value of the homes through the HBAs to conspire to fix the inflated commission fees charged to and paid by Plaintiffs and the putative Class Members;

j.  Whether Defendants violated the Sherman Act by attempting to monopolize the market for "right to list" agreements through 40-year contract terms;

k.  Whether the prices charged to the HBAs were supracompetitive, and higher than prices that would have been charged without the HBA;

l.   Whether Defendants through MV Realty made false representations to borrowers to actively conceal the HBA and supracompetitive prices resulting therefrom;

m.   Whether despite exercising reasonable due diligence, Plaintiffs and Class Members did not and could not have learned of the HBA, the supracompetitve prices charged for real estate commissions, and their injuries and actual damages therefrom, until contacted by counsel;

n.   Whether Plaintiffs and the Class Members are entitled to treble damages under the Sherman Act;

o.   Whether Plaintiffs and the Class Members are entitled to attorneys' fees and expenses under the Sherman Act;

p.   Whether Defendants' conduct violated state consumer protection laws;

q.   Whether Defendants' aided and abetted in the abuse of the legal process of recording liens on real property;

r.   Whether Defendants were unjustly enriched;

s.   Whether the agreements are void or unenforceable; and

t.   The nature and extent of damages suffered by the Class.

124.   **Typicality**: Plaintiffs' claims are typical of the putative Class, arising from the same deceptive practices.

125.   **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the putative Class and are represented by competent counsel.

126.   Separate actions by individual aggrieved or injured homeowners would create a risk of inconsistent or varying adjudications with respect to Class Members.

127.     Most Class Members are unaware of their rights to prosecute a claim against the

Defendants, and thus are unlikely to vindicate their rights through litigation.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF SHERMAN ACT (15 U.S.C. § 1)
### (Anti-Competitive Conduct and Restraint of Trade)

128.     Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

129.     Monroe Capital knowingly entered into a financing and strategic agreement with

MV Realty for the purpose of expanding and profiting from the HBA Scheme, despite having

actual or constructive knowledge of the program's anti-competitive and deceptive features.

130.     As part of this financing agreement, Monroe Capital obtained insider access and

influence over MV Realty's business decisions, including approval rights over geographic

expansion, underwriting rules, backup broker arrangements, and HBA valuation and pricing

structure, coordinating with MV Realty to implement a business model that reduced consumer

choice and foreclosed market competition in real estate brokerage services.

131.     Monroe Capital knew that MV Realty's business model emphasized revenue not

from traditional commission-based brokerage activity, but from contractual penalties through lien-

like instruments. The financing structure—in which MV Realty pledged HBA receivables and lien

rights as collateral to Monroe Capital—incentivized MV Realty to prioritize termination penalties

over customer service or brokerage performance.

132.     These actions constitute an unreasonable restraint of trade under Section 1 of the

Sherman Act, as they involved (1) concerted action, (2) intended to and resulting in foreclosure of

competing real estate brokers, and (3) imposition of contract terms that suppress consumer choice

and artificially inflate real estate transaction costs.

133.    Specifically, Monroe Capital's and MV Realty's conduct restrained trade and commerce among the several states in the following ways:

      a.  **Foreclosure of Competition:** Locking homeowners into using MV Realty as their real estate listing broker for 40 years, regardless of market changes, personal preferences or availability of better services, and preventing homeowners from freely selecting real estate agents, limiting competition for real estate brokerage fees on properties across 33 states.

      b.  **Barriers to Entry:** New real estate brokerages faced reduced access to the homeowner market because MV Realty preemptively locked in listings for generations. In addition, small and independent brokers may have been disproportionately harmed, unable to compete with a firm that has contractually cornered homeowners in advance;

      c.  **Impaired Market Functioning:** Clouding homeowners' titles with lien-like "memoranda," creating friction in real estate transactions and thus disrupting normal market sales. This scheme threatened to create market stagnation, as homeowners may delay selling or refinancing due to fear of penalties.

134.    By financing MV Realty's expansion and controlling MV Realty's operations and business strategy, Monroe Capital allowed MV Realty to expand this restrictive practice across multiple states, amplifying the impact on market competition and consumer choice.

135.    As a direct and proximate result of Defendants' restraint of trade and commerce, in violation of the Sherman Act, Plaintiffs and Class members were charged and paid more for real estate transactions than they otherwise would have without the agreements.

136.    As a direct and proximate result of Defendants' restraint of trade and commerce, in violation of the Sherman Act, Plaintiffs were injured and suffered actual damages.

### COUNT II: VIOLATION OF SHERMAN ACT (15 U.S.C. § 2)
### (Attempted Monopolization)

137.    Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

138.    MV Realty and Monroe Capital combined to monopolize the market for future listing rights by recording tens of thousands of HBAs across the United States—many against vulnerable homeowners—securing exclusive brokerage rights for up to 40 years and deterring alternative broker relationships through its 3% termination fees.

139.    In the New Business Presentation dated May 28, 2021 authored by Monroe Capital, Monroe described the HBA model as a "de novo residential real estate platform," distinguishing it from existing, competitive brokerage models.

140.    Monroe Capital also recognized that MV Realty had few competitors, noting that there is "a significant opportunity to quickly seize market share and become the dominant player in a new, niche asset class."

141.    It was Monroe Capital's intent to disrupt and redefine the residential real estate brokerage market—not through innovation in service quality or price, but through preemptive contractual encumbrances and long-term exclusive brokerage agreements secured via one-time cash inducements.

142.    Monroe Capital's financing enabled MV Realty to rapidly expand its geographic footprint, enter new markets before regulatory scrutiny could respond, and thereby capture advantage in this emerging coercive listing model and consolidate dominance in a market that MV and Monroe defined and controlled through legal encumbrances.

143.    Monroe Capital structured the financing and harvesting model to generate revenue not from competition, but from coercion, effectively converting property ownership into an income stream dependent on consumer lock-in and suppression of alternative services providers.

144.    These actions demonstrate an intent to monopolize, and a dangerous probability of success in doing so, by creating barriers to entry for unaffiliated brokers, depression consumer mobility, and distorting traditional listing economics.

145.    As a direct and proximate result of Defendants' attempted monopolization of the market for future listing rights, in violation of the Sherman Act, Plaintiffs were injured and suffered actual damages.

### COUNT III: VIOLATION OF RICO (18 U.S.C. § 1962(a))
### (Investment of Racketeering Income)

146.    Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

147.    The HBA Scheme constitutes "racketeering activity" in accordance with the definition set forth in 18 U.S.C. § 1961(1).

148.    The association of Monroe Capital and MV Realty in funding, directing, expanding, and perpetuating the HBA Scheme constitutes an "enterprise" for the purposes of 18 U.S.C. § 1962 and in accordance with the definition set forth in 18 U.S.C. § 1961(4).

149.    The enterprise conducted and participated in a pattern of racketeering activity including:

   a.   Wire fraud (18 U.S.C. § 1343)—through interstate electronic transmission of marketing materials, HBAs, lien filings, and investor presentations;

   b.   Mail fraud (18 U.S.C. § 1341)—including physical mailings of contracts and notices to consumers and country recorders;

c.  Collection of unlawful debts (18 U.S.C. § 1961(b))—by enforcing contractually disguised loans in violation of usury laws;

d.  Extortionate credit transactions (18 U.S.C. § 891, *et seq.*)—through deceptive and coercive collection practices tied to recorded liens.

150.    Through the HBA Scheme, Monroe Capital collected "unlawful debt" as defined under 18 U.S.C. § 1961(6). Unlawful debt includes debt "which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury." The HBA functions like a loan, not a real estate service contract. MV Realty advanced money in exchange for a future, secured repayment obligation, much like a high-interest loan. The 3% "termination fee" acts as interest, and its effective rate exceeded state usury caps (typically 18%–25%). By way of example, if a homeowner receives $500 for signing the HBA and sells the home five years later for $250,000, they owe MV Realty $7,500—a 1,400% return on the original payment.

151.    The activities of the HBA Scheme affect interstate commerce across more than 33 states.

152.    Monroe Capital violated RICO through the receipt of income derived, directly and indirectly, from the HBA Scheme, and through reinvesting the proceeds of such income in acquiring interest in, and establishing and operating, the HBA Scheme.

153.    Monroe Capital participated in the collection of unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and willfully reinvesting money for the purpose of furthering the unlawful scheme through expansion in other jurisdictions.

154.    Monroe Capital received income derived from a pattern of racketeering activity— including fraud related to the HBA scheme—and used or invested that income, directly and

indirectly, to expand MV Realty's operations into additional states and create new affiliate entities/enterprises.

155.    Plaintiffs and the Class Members were injured as a result of Monroe Capital's violations of 28 U.S.C. § 1962(a) because, without Monroe Capital's investment of racketeering proceeds, the Homebuyer Benefit Program would not have proliferated throughout 33 states and they would not have been coerced into incurring usurious debt.

156.    Plaintiffs and Class Members suffered injury to their properties caused by Monroe Capital's racketeering activities.

157.    Accordingly, Defendants are jointly and severally liable to Plaintiffs and the putative Class Members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

### COUNT IV: VIOLATION OF RICO (18 U.S.C. § 1962(b))
### (Acquisition or Maintenance of Control)

158.    Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

159.    As alleged above, Monroe Capital violated § 1962(b) of RICO by acquiring and maintaining interests in and control of the HBA Scheme.

160.    Specifically, Monroe Capital conditioned its $40 million credit facility on operational control rights (*e.g.,* approval of new jurisdictions, valuation methods, and requiring "backup broker" arrangements).

161.    Monroe Capital engaged in a pattern of racketeering activity, including by, *inter alia*, participating in the collection of the unlawful debt as MV Realty's sole secured creditor and a strategic partner and by aiding, abetting, procuring proceeds from the enterprise, and by willfully acquiring and maintaining interests in and control of the enterprise.

162.    Plaintiffs and the Class Members were injured as a result of Monroe Capital's violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for Monroe Capital's investment and participation in the HBA Scheme.

163.    Accordingly, Defendants are jointly and severally liable to Plaintiffs and the putative Class Members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT V: VIOLATION OF RICO (18 U.S.C. § 1962(c))
### (Conducting or Participating in Racketeering Activity)

164.    Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

165.    Monroe Capital associated with the enterprise and conducted or participated in the affairs of the enterprise, which existed for the purpose of engaging in racketeering activity.

166.    Monroe Capital knowingly participated in the racketeering scheme, not by merely funding it, but by co-steering it.

167.    Specifically, Monroe Capital received and reviewed HBAs, designed or directed key aspects of the business model, and assured the expansion of the HBA Scheme into new jurisdictions.

168.    Monroe Capital's participation in the enterprise violated § 1962(c) of RICO and caused Plaintiffs to pay exorbitant and unlawful "termination fees," lose equity in their homes, suffer an inability refinance or access the equity in their homes, have sales blocked or delayed due to clouds on their title, or otherwise pay inflated closing costs due to these encumbrances.

169.    Accordingly, Defendants are jointly and severally liable to Plaintiffs and the putative Class Members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT VI: RICO CONSPIRACY (18 U.S.C. § 1962(d))

170.    Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

171.    As alleged above, Monroe Capital violated RICO by entering into a series of agreements with MV Realty and related entities to finance, expand, direct, and perpetuate the HBA Scheme.

172.    Monroe Capital had a meeting of the minds with MV Realty and related entities to deceive homeowners through the HBA Scheme, derive income through the HBA Scheme, and otherwise engage in a pattern of racketeering activity.

173.    In furtherance of this conspiracy, Monroe Capital infused the HBA Scheme with a $40 million loan and otherwise provided strategic direction to MV Realty in the expansion and operation of the HBA program after the infusion of these funds in July 2021.

174.    In so doing, Monroe Capital conspired with MV Realty and related entities to engage in a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

175.    Accordingly, Defendants are jointly and severally liable to Plaintiffs and the putative Class Members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT VII: MARYLAND CONSUMER PROTECTION ACT
### (Md. Code. Com. Law § 13-301, *et seq.*)

176.    Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

177.    Plaintiffs, Justin Keller and Hailey Kardux, are Maryland homeowners who entered into a 40-year "right to list" agreement with MV Realty on February 28, 2022; they first learned of the cloud on their title from the HBA about November 2022. This claim is brought on behalf of all putative class members who are Maryland homeowners.

178. Plaintiffs Keller and Kardux entered into this agreement as part of Defendants' HBA Scheme.

179. As alleged above, MV Realty engaged in deceptive and unfair trade practices by inducing Maryland homeowners to enter into 40-year exclusive "right to list" agreements, in exchange for small cash payments, while failing to adequately disclose the agreements' long-term consequences. The HBAs were drafted in intentionally dense, confusing, and misleading language designed to obscure the economic consequences and deter informed consent.

180. MV Realty engaged in deceptive and unfair trade practices in failing to explain the permanence and severity of the listing encumbrance and failed to explain that a "memorandum of contract" would be filed in property records, clouding titles and interfering with homeowners' ability to sell or refinance their homes without paying significant penalties.

181. Furthermore, MV Realty engaged in deceptive and unfair trade practices in advertising the Homeowner Benefit Program without the intent to provide real estate brokerage services as offered, as demonstrated by the fact that MV Realty expanded the program into states where it did not employ any licensed real estate brokers.

182. Monroe Capital provided at least $40 million in funding to MV Realty, with full knowledge of the purpose and business model underlying MV Realty's operations, including the implementation of these contracts in Maryland.

183. At the time Monroe Capital funded MV Realty, they were fully aware of the nature of the HBA Scheme, and knew the agreements were designed to bind homeowners into unconscionable contracts that impaired property rights.

184. Monroe Capital had actual and constructive knowledge of the nature, form, and legal risks of the HBAs, based on its direct access to sample HBA contracts, internal revenue

models based on termination and refinance penalties, and recorded property encumbrances used to secure repayment.

185.    Monroe Capital provided strategic advice to MV Realty and approved the expansion of MV Realty's program into Maryland, conditioned funding on legal enforceability of liens, and structured its security interests around these encumbrances.

186.    Monroe Capital engaged in acts and practices in connection with Maryland consumer transactions, directly or indirectly affecting Maryland consumers by: (1) financing MV Realty's operations with actual knowledge of MV Realty's predatory scheme; (2) structuring this funding arrangement in a manner that incentivized or required the use of these unfair business practices in Maryland; and (3) acting as a strategic partner and influencing key aspects of MV Realty's business operations, such as HBA valuation, payout amounts, and pricing structure.

187.    Monroe Capital materially participated in a scheme that caused consumer harm, including, *inter alia*, by providing essential capital without which MV Realty could not have scaled its business model and expand its unfair business practices in Maryland.

188.    MV Realty entered the Maryland market in late 2021, after the influx of cash from Monroe Capital; within a year, MV Realty locked hundreds of Maryland homeowners—particularly in predominately African American neighborhoods in Baltimore—into 40-year "right to list" contracts enforceable through lien-like instruments and exorbitant termination fees.

189.    Under Md. Code. Com. Law. § 13-301, it is unlawful to engage in unfair, abusive, or deceptive trade practices in the conduct of any trade or commerce.

190.    Under Md. Code. Com. Law. § 13-301, deceptive trade practices include: misrepresentation or omission of material facts that deceive or tend to deceive, and failure to state material facts when omission deceives consumers.

191.    Monroe Capital's conduct, in funding and enabling the predatory HBA Scheme, constitutes knowing facilitation of unfair and deceptive acts and knowing participation in a scheme harmful to Maryland consumers. In engaging in the above-described acts and omissions, the Defendants acted unfairly and deceptively in violation of the Maryland Consumer Protection Act.

192.    Plaintiffs and the putative Class Members justifiably and reasonably relied on MV Realty's misrepresentations, omissions and deceptive practices, which were facilitated and perpetuated by Monroe Capital, and were induced to enter into the Homebuyer Benefit Program.

193.    Monroe Capital conspired through express agreement with MV Realty to engage in unfair and deceptive trade practices with respect to consumer transactions in the State of Maryland.

194.    Plaintiffs and the putative Class Members have suffered injury, including impaired property rights due to clouded title, and financial harm associated with potential penalties, refinancing costs, and legal fees to remove the contractual encumbrance.

195.    Under Md. Code Com. Law § 13-408, Plaintiffs Justin Keller and Hailey Kardux, and similarly situated Class Members who are Maryland homeowners, are entitled to damages for their actual losses, reasonable attorneys' fees and costs, injunctive and equitable relief to terminate the scheme and void related agreements.

## COUNT VIII: NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT

### (N.C. Gen. Stat. § 75-1.1, *et seq.*)

196.    Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

197.    Plaintiff Patricia Bandy resides in North Carolina and signed a "right-to-list" agreement with MV Realty on February 22, 2021; she first learned of the cloud on the title about July 2022.  Plaintiff Bandy subsequently paid a termination fee of $11,714.40 to terminate the

agreement in September 2022. This claim is brought on behalf of all putative Class Members who are North Carolina homeowners.

198.    As alleged above, MV Realty engaged in deceptive and unfair trade practices by inducing homeowners in North Carolina to enter into 40-year exclusive "right to list" agreements, in exchange for small cash payments, while failing to adequately disclose the agreements' long-term consequences.

199.    MV Realty engaged in deceptive and unfair trade practices in failing to explain the permanence and severity of the listing encumbrance and failed to explain that a "memorandum of contract" would be filed in property records, clouding titles and interfering with homeowners' ability to sell or refinance their homes without paying significant penalties.

200.    Monroe Capital provided at least $40 million in funding to MV Realty, with full knowledge of the purpose and business model underlying MV Realty's operations, including the implementation of these contracts in North Carolina.

201.    At the time Monroe Capital funded MV Realty, they were aware of the nature of MV Realty's HBA Scheme and knew that the agreements were designed to bind homeowners into unconscionable contracts that impaired property rights.

202.    Monroe Capital engaged in acts and practices in connection with consumer transactions, directly or indirectly affecting consumers in North Carolina by: (1) financing MV Realty's operations with actual knowledge of MV Realty's predatory HBA Scheme; (2) structuring this funding arrangement in a manner that incentivized or required the use of these unfair business practices in North Carolina; and (3) acting as a strategic partner and influencing key aspects of MV Realty's business operations, such as HBA valuation, payout amounts, and pricing structure..

203.    Monroe Capital's conduct constitutes a contributory or vicarious unfair trade practice actionable under North Carolina Law. Monroe Capital materially and knowingly participated in a scheme that caused consumer harm, by providing essential capital without which MV Realty could not have scaled its business model and expanded its unfair and deceptive business practices in North Carolina. Monroe Capital provided capital that was used directly to solicit North Carolina consumers into oppressive and deceptive agreements, including, *inter alia*, through proliferation of telemarketing campaigns and targeted/"geo fencing" online advertisements promising quick cash with no obligation to repay funds.

204.    Monroe Capital's conduct violates N.C. Gen. Stat. § 75-1.1, which prohibits unfair or deceptive acts or practices in or affecting commerce and conduct that offends established public policy, is unethical, oppressive, unscrupulous or substantially injurious to consumers.

205.    Monroe Capital's conduct in funding, enabling, and expanding the predatory listing contract scheme, constitutes knowing facilitation of unfair and deceptive acts, and knowing participation in a scheme harmful to North Carolina consumers.

206.    Plaintiff Brady and putative Class Members have suffered injury, including impaired property rights due to clouded title, and financial harm associated with potential penalties, refinancing costs, and legal fees to remove the contractual encumbrance.

207.    Under N.C. Gen. Stat. § 75-16, Plaintiff Brady and similarly situated Class Members are entitled to treble damages for their actual losses, attorneys' fees and costs, injunctive and equitable relief to terminate the scheme and void related agreements.

### COUNT IX: AIDING AND ABETTING THE ABUSE OF PROCESS

208.    Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

209.    MV Realty filed and recorded "memoranda of contract" tied to the HBAs in county and municipal land records in all 33 states in which MV Realty operated. These instruments encumbered the title to homeowners' property—functioning as liens or restrictive covenants—to secure future payment if the homeowner sold the home without using MV Realty as the listing agent, even decades later. This constitutes use of legal process (recording encumbrances pursuant to state property law procedures).

210.    After these documents were recorded, MV Realty willfully used the recorded encumbrances for purposes that are wholly unrelated to the process's intended function, including:

    a.  forcing homeowners to list their property with MV Realty (even if the broker did little or nothing to market their home), or pay penalties; and

    b.  interfere with homeowner property rights (those attempting to refinance, obtain a home equity loan, transfer title, or sell their property).

211.    MV Realty's use of process was contrary to the proper function of a lien, which is to secure a legitimate, present debt—not to lock in a future revenue stream, which could be enforced decades later, sold to third parties, or used as leverage in litigation.

212.    The misuse occurred after the process was issued. MV Realty and Monroe Capital did not merely file these liens and walk away. They monitored homeowner activity and actively enforced or threatened enforcement of the lien when a sale was imminent, unless the homeowner paid an early termination fee, used MV Realty as an agent against their will, or agreed to unfavorable terms to remove the encumbrance.

213.    These liens were not used by MV Realty and Monroe Capital as legitimate instruments to protect broker commission rights, but as tools to coerce early termination payments,

suppress homeowner mobility, and artificially inflate the perceived value of MV Realty's receivables.

214.    Pursuant to § 876 of the Restatement (2d) of Torts, one is subject to liability to the harm resulting to a person from the tortious conduct of another if he acts in concert with the other or pursuit to a common design, or knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so conduct himself.

215.    Monroe Capital acted in concert with or otherwise provided substantial assistance to MV Realty in the abuse of legal process by: structuring a $40 million credit facility backed by lien-encumbered receivables; requiring MV Realty to maintain lien coverage on enrolled properties; enforcing financial triggers that penalized MV for failure to record liens, and supporting the expansion of HBAs into 33 states and encouraging MV Realty's legal position that HBAs and related liens did not violate the law, despite awareness of their coercive and oppressive nature and their questionable lawfulness.

216.    Monroe Capital's intent was to profit from lien-based termination fees and convert lien-backed receivables into a securitized or monetizable asset class. Monroe aided MV Realty in weaponizing the lien process for unlawful debt collection and coercion/leverage purposes, not to secure unpaid commissions.

217.    As a direct and proximate result of Monroe Capital's aiding and abetting abuse of process, Plaintiffs and the Class Members had liens placed on their homes without informed consent; were impeded from refinancing, selling, or transferring title without incurring improper penalties; and suffered financial damage, duress, and emotional harm.

## COUNT X: AIDING AND ABETTING FRAUD

218.    Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

219.    MV Realty knowingly engaged in a fraudulent scheme to deceive consumers into signing HBAs by misrepresenting the nature of the agreements, failing to disclose material terms, and obscuring the true legal and financial consequences of the liens that MV Realty recorded against consumers' homes.

220.    The fraudulent conduct included, but was not limited to:

    a.    Misrepresenting the HBAs as "free money" or "grants" without disclosing that the agreements created a binding 40-year obligation to use MV Realty as the exclusive listing agent or pay termination fees often exceeding ten times the cash payment consumers received;

    b.    Failing to disclose that MV Realty would record a lien or "memorandum" encumbering the homeowner's title, restricting consumers' ability to sell or transfer title, refinance their mortgage loan, or access their equity;

    c.    Using misleading marketing tactics including telling consumers "this is not a loan," stating MV Realty "will never come after you," and references to government programs, "stimulus" funds, or "homeowner relief," suggesting official affiliation;

    d.    Burying critical terms in fine print or in separate linked documents or failing to provide homeowners with a copy of the executed agreement at all.

221.    Monroe Capital knowingly and substantially assisted MV Realty in this fraudulent scheme.

222.    Monroe Capital learned of MV Realty's business practices—including the HBAs, the lien strategy, and the nature of MV Realty's consumer marketing—no later than May 2021,

when it reviewed or authored the "New Business Presentation" analyzing MV Realty's business model, and thereafter actively assisted MV Realty in perpetuating the fraudulent HBA Scheme.

223.    Monroe Capital did not merely invest passively. As a condition of the $40 million credit facility, Monroe obtained extensive oversight and control rights, including rights over lien perfection, geographic expansion, and enforcement of financial covenants tied to lien-recording practices. Monroe reviewed, approved, and in some instances directed MV's lien-recording and compliance practices.

224.    Monroe Capital's decision to fund and support MV Realty's HBA program—despite its knowledge of the deceptive marketing practices and exploitative terms—constitutes substantial assistance in the commission of the underlying fraud.

225.    Monroe Capital's control, direction, assistance, and participation enabled MV Realty to expand into new markets, intensify its marketing efforts targeting low-income and vulnerable homeowners, record thousands of additional liens, and sustain and scale a business model predicated on consumer deception and contractual ambush.

226.    Without Monroe Capital's control, direction, assistance and participation in the fraudulent HBA Scheme, MV Realty would not have been able to perpetuate the fraud on the Plaintiffs and the putative Class Members.

227.    Monroe Capital is therefore liable for aiding and abetting MV Realty's fraud under common law principles, including those set forth in Restatement (Second) of Torts § 876(b).

228.    As a direct and proximate result of Monroe Capital's knowing and substantial assistance in MV Realty's scheme, Plaintiffs and the class members were harmed by entering into HBAs under false pretenses, incurring usurious termination fees, suffering title encumbrances and financial distress, and suffering additional economic and non-economic damages.

## COUNT XI: UNJUST ENRICHMENT

229.    Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

230.    All HBAs are illegal, improper, and void.

231.    Plaintiffs and the class members conferred a benefit on Monroe Capital when they paid penalties on the illegal loans; Monroe Capital knew or should have known of the benefits; and Monroe Capital has been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

232.    Accordingly, on behalf of themselves and all other national consumers similarly situated, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any agreements with MV Realty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that the Court:

1.    Certify the Class under Rule 23;

2.    Award compensatory, statutory, and treble damages to Plaintiffs and Class Members;

3.    Order restitution and disgorgement of ill-gotten gains;

4.    Declare the agreements void and unenforceable;

5.    Award injunctive relief to prohibit further deceptive practices;

6.    Treble damages pursuant to 18 U.S.C. § 1964(c) and 15 U.S.C. § 15(a), and/or N.C. Gen. Stat. § 75-16;

7.    Award reasonable attorney's fees and costs pursuant to 15 U.S.C. § 15(a), and/or 18 U.S.C. §1964(c), and/or Md. Code, Com. Law § 13-408(b), and/or N.C. Gen. Stat. § 75-16.1; and

8.    Grant such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

/s/ *Drew LaFramboise*
Drew LaFramboise (#20288)
Lacey Logsdon McMullan (#31623)
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770-1417
Ph: (240) 553-1209
F: (240) 553-1740
dlaframboise@jgllaw.com
lmcmullan@jgllaw.com

KEILTY BONADIO

/s/ *Thomas W. Keilty*
Thomas W. Keilty (#18992)
Nicholas C. Bonadio (#13679)
One South Street
1 South Street, Suite 2125
Baltimore, MD 21202
(410) 469-9953
tkeilty@kblitigation.com

*Counsel for Plaintiffs and the Putative Class*